*117*

Receipt Number
*568214*

w|EX. A-O

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DONALD E. HAASE and DOUGLAS K. HAASE
individually, and on behalf of all others similarly
situated

       Plaintiffs,

v.

FRANK J. BLUESTEIN, individually,
THE MAXIMUM FINANCIAL GROUP, INC., a
Michigan corporation, QUESTAR CAPITAL
CORPORATION, a Michigan corporation,
and GUNNALLEN FINANCIAL, INC., a
Florida corporation, jointly and severally,

       Defendants.

Case: 2:08-cv-10927
Judge: Cook, Julian Abele
Referral MJ: Morgan, Virginia M
Filed: 03-04-2008 At 01:53 PM
CMP HAASE, ET AL V BLUESTEIN, ET AL
(DAT)

---

**CLASS ACTION
COMPLAINT AND JURY
DEMAND**

---

SOMMERS SCHWARTZ, PC
Andrew Kochanowski (P55117)
Lisa R. Mikalonis (P39485)
2000 Town Center, Suite 900
Southfield, MI 48075
(248) 355-0300

*Attorneys for Plaintiffs*

PAUL L. NINE & ASSOCIATES PC
Paul L. Nine (P18307)
Darin J. LeBeau (P54875)
Attorneys for Plaintiffs
100 W. Long Lake Road, Ste. 102
Bloomfield Hills, MI 48304
(248) 644-5500

*Attorneys for Plaintiffs*

J. THOMPSON & ASSOCIATES PLC
Jason J. Thompson (P47184)
Attorney for Plaintiffs
2000 Town Center, Suite 1000
Southfield, MI 48075
(248) 436-8448

*Attorneys for Plaintiffs*

ZIMMERMAN REED, PLLP
Timothy J. Becker
Kirsten D. Hedberg
Attorneys for Plaintiffs
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
(612) 341-0400

*Attorneys for Plaintiffs*

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

## TABLE OF CONTENTS

CLASS ACTION COMPLAINT AND JURY DEMAND ........................................................... 1

NATURE OF THE ACTION ........................................................................................................ 1

INVESTMENT FRAUD ............................................................................................................... 2

JURISDICTION AND VENUE .................................................................................................... 5

THE PARTIES AND KEY PLAYERS ........................................................................................ 5

FACTS ............................................................................................................................................ 8

    A.     DEFENDANTS SOLD UNREGISTERED SECURITIES TO INVESTORS ................. 8

    B.     NO SAFE HARBOR ............................................................................................... 8

    C.     THE "PONZI" SCHEME AND REPRESENTAIONS .......................................... 9

    D.     SPECIFIC EXAMLES OF PHONY LIMITED LIABILITY COMPANIES ................. 13

          (a).    Hilton Hotels ........................................................................................... 14

          (b).    MGM Grand Hotel .................................................................................. 14

          (c).    Motel 6 ..................................................................................................... 15

          (d).    Tropicana Resort Casino ........................................................................ 15

          (e).    Sheraton Hotels ...................................................................................... 16

    E.     COLLAPSE OF THE PONZI SCHEME ............................................................. 16

    F.     THE DISINTEGRATION OF THE MAY-BLUESTEIN RELATIONSHIP ................. 18

    G.     LOSS CAUSATION/ECONOMIC LOSS ......................................................... 19

CLASS ALLEGATIONS ............................................................................................................ 20

COUNT I     VIOLATIONS OF SECTION 12(1) OF THE SECURITIES ACT OF
             1933 .......................................................................................................... 22

COUNT II    VIOLATION OF SECTION 12(2) OF THE SECURITIES ACT OF
             1933 .......................................................................................................... 23

COUNT III   VIOLATION OF SECTION 15 OF THE SECURITIES ACT OF 1933
             (AGAINST DEFENDANTS QUESTAR AND GUNNALLEN) ................................. 25

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

COUNT IV      VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND
              RULE 10(B)-5 PROMULGATED THEREUNDER.......................................................... 25

COUNT V       VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT
              (AGAINST DEFENDANTS QUESTAR AND GUNNALLEN) .................................. 27

COUNT VI      VIOLATIONS OF SECTION 301 OF THE MICHIGAN UNIFORM
              SECURITIES ACT .......................................................................................................... 28

COUNT VII     VIOLATION OF SECTION 410 OF THE MICHIGAN UNIFORM
              SECURITIES ACT .......................................................................................................... 28

COUNT VIII    VIOLATION OF SECTION 451 OF THE MICHIGAN UNIFORM
              SECURITIES ACT (AGAINST DEFENDANTS BLUESTEIN,
              QUESTAR AND GUNNALLEN) ................................................................................. 29

COUNT IX      FAILURE TO SUPERVISE  (AGAINST DEFENDANTS QUESTAR
              AND GUNNALLEN)........................................................................................................ 30

COUNT X       FRAUD (AGAINST DEFENDANTS BLUESTEIN AND MAXIMUM) ................... 31

COUNT XI      NEGLIGENT MISREPRESENTATION (AGAINST DEFENDANTS
              BLUESTEIN AND MAXIMUM) ................................................................................... 33

COUNT XII     RESPONDEAT SUPERIOR  (AGAINST DEFENDANTS QUESTAR
              AND GUNNALLEN)........................................................................................................ 34

COUNT XIII    APPARENT AUTHORITY  (AGAINST DEFENDANTS QUESTAR
              AND GUNNALLEN)........................................................................................................ 35

COUNT XIV     BREACH OF FIDUCIARY DUTY ............................................................................. 37

COUNT XV      NEGLIGENCE ................................................................................................................ 38

COUNT XVI     CIVIL CONSPIRACY.................................................................................................... 39

COUNT XVII    UNJUST ENRICHMENT (IN THE ALTERNATIVE).................................................. 39

COUNT XVIII   VIOLATION OF § 1962(A) AND (D) OF THE RACKETEER
              INFLUENCED AND CORRUPT ORGANIZATIONS ("RICO") ACT (AGAINST
              DEFENDANTS BLUESTEIN AND MAXIMUM)........................................40

    A.        ENTERPRISES.................................................................................................................. 40

    B.        COMMON PURPOSE....................................................................................................... 41

    C.        RACKETEERING AND PATERN OF ACTIVITY......................................................... 41

    D.        RICO VIOLATIONS......................................................................................................... 43

LAW OFFICES
SOMMERS SCHWARTZ, P.C.  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300
2000 TOWN CENTER

RELIEF REQUESTED....................................................................................................... 43

DEMAND FOR A TRIAL BY JURY ............................................................................... 44

LAW OFFICES
**SOMMERS SCHWARTZ, P.C.**
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs, Donald E. Haase and Douglas, individually, and on behalf of all others similarly situated, by their attorneys, SOMMERS SCHWARTZ P.C., J. THOMPSON & ASSOCIATES PLC, PAUL L. NINE & ASSOCIATES, P.C., and ZIMMERMAN REED, PLLP for their Class Action Complaint, allege the following upon personal knowledge as to themselves and own acts and upon information and belief as to all other matters based upon the investigation made by and through counsel, and the investigation and complaints filed by the United States Securities and Exchange Commission.

## NATURE OF THE ACTION

1.      This case involves a massive twelve-year long "Ponzi" scheme perpetrated by attorney Edward P. May ("May") in which May erected phony businesses with no actual operations and nonexistent streams of revenue. Registered stockbroker Frank J. Bluestein ("Bluestein") and Bluestein's company, The Maximum Financial Group, Inc. ("Maximum") facilitated the scheme over the years with the assistance of broker-dealer Defendants, Questar Capital Corporation ("Questar") and GunnAllen Financial Inc. ("GunnAllen"). Bluestein, cloaked with broker-dealer Defendants' goodwill, authenticity and credibility, solicited investors from his client base to invest in the May companies.   Trusting Bluestein and the broker-dealer Defendants, Plaintiffs invested their personal funds in unregistered securities by purchasing interests in a host of phony limited liability companies ("LLCs") created by May that allegedly held contracts to provide telecommunication services to businesses, mainly hotels and casinos. Plaintiffs include from 700 to 1000 investors from around the country, but primarily in Southeast Michigan.

2.      The telecommunication contracts that the LLCs allegedly held were in fact nonexistent. There were no contracts, and there were no revenue streams being generated by the LLCs in which

1

Plaintiffs invested.  There were no LLC's.  The entire operation was an absolute scam.  Losses have been estimated to be as high as $350,000.000.00.

3.       The story of the Ponzi scheme led by May, and his company, E-M Management Co. LLC ("E-M") first became public in 2007.  It has been reported on several web sites, including the GunnAllen web site, in various newspapers and has been the subject of a WJBK Fox2 News "Hall of Shame" story. It has also led to a lawsuit filed against May and E-M by the United States Securities and Exchange Commission in the Federal District Court for the Eastern District of Michigan, Case No. 2:07-cv-14954.

4.       Bluestein, May and GunnAllen are now all pointing fingers at one another. No one has taken responsibility for the hundreds of millions of dollars in losses suffered by Plaintiffs, many of whom were retirees and elderly persons, and none of whom could afford the losses and were otherwise dependent upon the money.

## INVESTMENT FRAUD

5.       The Ponzi scheme in this case, unfortunately, was by no means a unique example of modern-day investment fraud that plagues the private investor world.  In fact, investment fraud, and cries for increased protection of public investors, has been in the headlines for the past several years. Top sources in the field have identified the following areas of concern for regulation and compliance scrutiny: targeting elderly investors, revenue growth, and communications with the public.[1]  All three areas were exploited in this instance.

6.       Telecommunications-based business scams have been well known to broker-dealers like GunnAllen and Questar for decades prior to this scam.  As the Federal Trade Commission reported,[2] during the telecommunications boom in the mid-1980's, news stories reported that telecommunications businesses were reaping tremendous wealth.  Scam artists created investment schemes that imitated

---

[1]  http://registeredrep.com/advisorland/regulatory/top_compliance_issues/

2

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

legitimate entrepreneurs, and told consumers that their investment offerings were acquiring Federal Communications Commission (FCC) licenses or capitalizing telecommunications systems, such as cellular phone, wireless cable systems, Specialized Mobile Radio, and Interactive Video Data Service companies.[3] Fraudulent promoters falsely touted these ventures as high-profit, low-risk investments, even though they were high-risk, long-term, and capital-intensive.

7.     By late 1995, fraudulent telemarketers were offering to acquire FCC paging licenses for consumers for hefty prices, claiming to put consumers in control of the airwaves so that paging companies would lease or buy the rights to use airwaves from them. Fraud promoters told consumers they could boost their previous "investments" by acquiring new, purportedly profitable, paging licenses. These scam artists published success stories of real investors in these fields to tout fraudulent offerings.

8.     Indeed, many defendants in FTC law enforcement actions simply hyped the information superhighway as the primary reason to invest in such offerings. These high-tech investment frauds alone cost consumers millions of dollars--almost 15 percent of all consumer losses reported in the FTC/NAAG Telemarketing Complaint System by December 31, 1996. In recent years, both the FTC and the SEC have brought many individual enforcement actions involving these high-tech investments.[4]

9.     In 2004, the United Stated Senate Special Committee on Aging held hearings which included testimony from specialists on broker-dealer fraud. Tanya Solov, NASAA Broker-Dealer Chair, stated: "In a perfect storm, a number of significant events come together to create a devastating impact.

---

[2]  http://www.ftc.gov/reports/Fraud/invest.shtm
[3]  For SMR cases, see, e.g., FTC v. Digital Communications, Inc., No. 93-6648-JGD (JRX) (C.D. Cal. 1995) (stipulated permanent injunction; summary judgment against one defendant); FTC v. Metropolitan Communications, Corp., No. 94-Civ-0142 (JFK) (S.D. N.Y. 1994) (stipulated preliminary injunction entered; case pending); for IVDS cases, see, e.g., FTC v. Chase McNulty Group, Inc., No. 95-524-CIV-T-25F (M.D. Fla. 1994), FTC v. Digital Interactive Associates, Inc., No. 95-Z-754 (D. Colo. 1995).
[4]  http://www.ftc.gov/reports/Fraud/invest.shtm

State securities regulators are deeply concerned that a perfect storm for investment fraud is brewing and our nation's 35 million seniors are most at risk."[5]

10.    The SEC commissioned the Rand Corp to conduct a study to determine why investors had a hard time understanding the role of broker-dealers and their standard of care when it comes to financial services.[6]   The study was commissioned because, "[i]n recent years, the evolution of the financial services industry has blurred traditional distinctions between broker-dealer and investment advisers and made it difficult to design appropriate regulatory schemes for their professional services"[7]

11.    To respond to the glaring deficiencies and continued failures by the financial services industry to enforce anti-fraud rules and regulations designed to protect the public, the SEC enacted the CCOutreach Program.[8]   As described by the SEC:

> The *CCOutreach* program for broker-dealer Chief Compliance Officers ("CCOs") is designed to further promote strong compliance practices for the protection of investors. The program is intended to foster communication about compliance risks and effective compliance controls, with the goal of helping CCOs foster stronger compliance programs within their firms. The *CCOutreach BD* Program is sponsored jointly by the SEC's Office of Compliance Inspections and Examinations, in coordination with the Division of Trading and Markets, and the Financial Industry Regulatory Authority ("FINRA").

12.    The financial losses suffered by Plaintiffs in this case arose out of the same type of investor fraud that had been well known and the subject of much discussion among broker dealers, Wall Street, and government regulators prior to May and Bluestein defrauding plaintiffs and the putative class here. Broker-Dealers, such as Questar and GunnAllen, were fully aware of these exact types of abuses and their obligation to monitor, audit and investigate their brokers, especially registered brokers operating as office mangers like Bluestein, to protect their clients. This entire story merely confirms the

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

---

[5]  http://www.nasaa.org/Issues__Answers/Legislative_Activity/Testimony/417.cfm

[6]  http://www.sec.gov/news/press/2008/2008-1_randiabdreport.pdf

[7]  Id at p.3.

[8]  http://www.sec.gov/info/bdccoutreach.htm

4

longstanding and, unfortunately all too common, soft underbelly of the investment world for the past decade: inadequate protection of the private investor.

## JURISDICTION AND VENUE

13.     Plaintiffs seek damages on behalf of themselves, and pursuant to Fed. R. Civ. P. 23 other similarly situated victims, of the Ponzi scheme perpetrated by the Defendants in violation of Michigan and Federal Securities laws, RICO and State common law which occurred during the class period, 2000 through 2007.

14.     The jurisdiction of this court is based on §22 of the Securities Act of 1933 ("Securities Act"), 15 USC §77v, Section 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 USC §78aa, 28 USC §1331 and principles of supplemental jurisdiction, 28 U.S.C. § 1367. Venue is proper in this district pursuant to §27 of the Exchange Act and 28 USC §1391(b). Many of the acts herein, including the dissemination to the investing public of the misleading statements and omissions at issue, occurred in substantial part in this district. Moreover, Defendants conducted substantial business in this district.

15.     In connection with the acts, transactions and conduct alleged herein, Defendants used the means and instrumentalities of interstate commerce, including the United States mail, wires and telephones.

## THE PARTIES AND KEY PLAYERS

16.     Plaintiff Donald E. Haase resides in the State of Michigan, County of Oakland, and invested in unregistered securities through Bluestein May and/or their related companies and related entities, including Defendants Questar and GunnAllen.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

17. Plaintiff Douglas K. Haase resides in the State of Michigan, County of Oakland, and invested in unregistered securities through Bluestein May and/or their related companies and related entities, including Defendants Questar and GunnAllen.

18. Defendant Questar Capital Corporation, is a Michigan corporation with is headquarters located at 5701 Golden Hills Drive, Minneapolis, Minnesota 55416. Questar is a securities broker-dealer registered with FINRA and SIPC, with its registered agent located at 30600 Telegraph Road, Bingham Farms, Michigan 48025. Questar held Bluestein's license from 2000 to 2005.

19. Defendant GunnAllen Financial, Inc., is a Florida corporation, and is registered with (i) Financial Industry Regulatory Authority ("FINRA")[9], (ii) the Securities Investor Protection Corporation ("SIPC"), and (iii) the National Futures Association ("NFA"). It is a securities broker-dealer and SEC registered investment advisor operating in all 50 states. GunnAllen's corporate headquarters is 5002 West Waters Avenue, Tampa, Florida 33634. At all relevant times GunnAllen maintained a Michigan branch office managed by Bluestein and located at 5225 Highland Road, Waterford, Michigan 48327. From 2005 through 2007, GunnAllen held the broker license of Bluestein, who was also the Waterford Michigan Branch Office Manager.

20. Edward P. May was a Michigan attorney who upon information and belief was sued in Oakland County Circuit Court by the Michigan State Bar Association on two occasions resulting in his disbarment almost twenty (20) years ago in the 1980s. He is a resident of Oakland County, Michigan, and controlling manager/member of E-M . Recently, Mr. May filed bankruptcy and is therefore not a named defendant in this action.

---

[9] FINRA maintains extensive rules in order to be registered.
(http://www.finra.org/RegistrationQualifications/index.htm).

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

21.     E-M Management Co. L.L.C. is a Michigan LLC with its headquarters located at 720 N. Lapeer Road, Suite 202, Lake Orion, Michigan 48362. Recently, E-M filed bankruptcy and is therefore not a named defendant in this action.

22.     Defendant Frank J. Bluestein at all relevant times was a resident of Oakland County, State of Michigan, and worked as a stock broker and investment advisor. Bluestein was a registered broker and representative of Questar from 2000 to sometime in 2005, and then a registered broker and representative of GunnAllen from sometime in 2005 through late 2007 during which time he managed GunnAllen's Waterford, Michigan office. In addition, Mr. Bluestein publically operated Maximum, a registered investment company, also listed as having an office at 5225 Highland Road, Waterford, Michigan 48327.

23.     Defendant The Maximum Financial Group, Inc. ("Maximum") is a Michigan corporation with its headquarters and registered agent located at 5225 Highland Road, Waterford, Michigan 48327.

24.     In the summer of 2007, Bluestein and Maximum were ranked by Registered Rep, a trade publication as the fourth-largest independent-contractor registered representative, with $1 billion in client assets.[10]  Maximum was listed by that publication as a GunnAllen agent. Upon information and belief, this listing was one of many indicating that Bluestein and Maximum were registered representatives of Defendant GunnAllen.

25.     Fast Frank Inc. ("FF Inc.") is a Michigan corporation owned by Bluestein and also located at the same address as Maximum's office and GunnAllen's Waterford office, 5225 Highland Road, Waterford, Michigan 48327. Bluestein represented to the Plaintiffs that FF Inc. would oversee and "audit" all of the LLCs invested in by the Plaintiffs. Indeed, in connection with the sale of the interests in the LLCs, Bluestein solicited Plaintiffs to pay at least $1,000 to FF Inc. for each investment.

---

[10] http://registeredrep.com/mag/top_independent_advisors/index.html

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

# FACTS

### A.   DEFENDANTS SOLD UNREGISTERED SECURITIES TO INVESTORS

26.     The interest in the LLCs that Defendants offered and sold to investors were securities as defined by the securities laws of the State of Michigan and the United States.

27.     No registration of these securities was ever filed as required by the securities laws of the State of Michigan and the United States for any of the interests of LLCs that Defendants offered and sold to investors.

28.     This action does not, however, involve "covered securities" as that term is defined under federal securities laws, 15 U.S.C. § 77r(b).

### B.   NO SAFE HARBOR

29.     The statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to the allegedly false statements pleaded in this complaint. The specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements pleaded herein. Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

## C.   THE "PONZI" SCHEME AND REPRESENTAIONS

30.   As stated above, May, E-M and with the help of Defendant Bluestein and the broker-dealer Defendants, snared innocent investors into purchasing worthless securities on the promises of monthly income in return.

31.   To perpetrate their scheme to sell fraudulent unregistered securities to unsuspecting investors, May and E-M relied on a network of individuals to solicit those investors. One of the individuals May and E-M relied on to solicit investors was Bluestein, individually, as an owner of Maximum, and as a registered representative of first Questar and then GunnAllen.

32.   One of the various methods Bluestein used to solicit investors was to organize "investment seminars" to entice investors, including elderly individuals, to invest in the May LLC's. Upon information and belief, GunnAllen employees attended some of these seminars and were present when Bluestein discussed investing in the LLCs.

33.   Bluestein also solicited investors for the May LLC's by telephonic means, in writing and in person.

34.   Bluestein leveraged his position as a Questar, then GunnAllen, backed and supported dealer and advisor to gain the trust and confidence of clients. Many, if not all of his clients purchased legitimate securities with Questar and/or GunnAllen acting as a broker-dealer prior to purchasing May's fraudulent LLC's.

35.   Many of the offering materials for the May LLCs typically included a Private Offering Memorandum, (POM) which described the security being issued and the purpose of the venture **(Exhibit A, Sample Subscription Offering Memorandum)** and included a "Subscription Agreement" that each investor was required to sign to purchase an interest in a May LLC. **Exhibit B (Sample Subscription Agreement)**. The Subscription Agreement set forth the monthly payment income for the guarantee period.

9

36.   Each and every representation in the POM's and Subscription Agreements were false because the underlying project was fictitious and nonexistent.

37.   Additionally, many of the May LLC offering materials provided to investors even contained what appeared to be contracts with large hotel and/or casino enterprises including Hilton Hotels, MGM Grand Hotels, Motel 6, Tropicana Resort Casino, and Sheraton Hotels, for the supposed installation and servicing of telecommunications equipment. **Exhibit C (Sample Contract for Telecommunications Installation and Service)**.   Each and every representation in the contracts was false because the underlying project was fictitious and nonexistent.

38.   Through the offering materials, and through oral and written statements to investors, Defendant Bluestein, and aided by May, Questar, and GunnAllen, represented to investors that the LLCs had existing contracts with hotel and casino chains to provide telecommunication equipment and services; that the LLC's earned revenue from the telecommunication contracts; that the investors would receive their principal back, "guaranteed"; that investors would receive additional monies as a return on their investment; and that FF Inc. would monitor and "audit" the companies to ensure investor protection.

39.   Defendants Bluestein, aided by May, Questar, and GunnAllen, further promised investors, both orally and in writing, that they would receive returns in the form of monthly payments for as much as 12-14 years. Through the fraudulent scheme, Bluestein, May, and E-M "guaranteed" that investors would receive monthly revenue checks for between 20-24 months beginning soon after they invested and then unguaranteed monthly returns thereafter for the life of the agreement.  Defendants represented both orally and in writing that the monthly payments would derive from fees to be paid by hotels and casinos for the use of telecommunication equipment pursuant to the fabricated contracts.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

40. Many of the May LLC offering materials distributed to investors by Defendant Bluestein, aided by Questar, and GunnAllen, included Defendants' written representation of the guarantee and monthly returns in a document entitled an "Investment Recap." In a line item, it describes the guarantee as: GUARANTEE: $42,800.00/month, 20 months. **Exhibit D (Sample Investment Recap).**

41. The "Investment Recap" also sets forth detailed information about the hotels purportedly under contract with the LLC investment, and claims to identify investment levels as to room equipment, public use equipment, and costs. Upon information and belief, the information contained in such Investment Recaps was and is entirely fictitious.

42. In connection with the purchase of the LLC interests, investors also signed agreements with FF Inc. agreeing to pay FF Inc. $1,000.00 per investment for audit services. **Exhibit E (Sample FF Inc. Agreement).**

43. According to the offering materials, investor funds were to be pooled on an offering-by-offering basis for the purpose of installing and servicing telecommunications equipment for hotels and casinos. In reality, investor funds from the various offerings were commingled together into a single pool.

44. Defendant Bluestein solicited investors to purchase interests in the May Ponzi scheme from his pool of clients while working as a registered agent and on behalf of Questar Capital Corp from 2000 to 2005.

45. After leaving Questar, Defendant Bluestein solicited investors to purchase interests in the May Ponzi scheme from his pool of clients while working as a registered agent and Branch Office Manager and on behalf of GunnAllen from 2005 until October 2007.

46. Questar and GunnAllen held out Bluestein to the Plaintiffs and the class as first Questar's and then GunnAllen's registered securities agent based on written material, including business cards and

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

11

office signage, all of which mentioned the broker-dealers by name. **See e.g., Exhibit F (Copy of Maximum Business Card)**. In numerous articles written in various financial periodicals, Bluestein was held out by GunnAllen as GunnAllen's "poster boy" and "golden child", with allegedly more than $1 billion in management.

47.     Furthermore, Bluestein through Maximum, wrote newsletters clearly indicating to the reader, including the defrauded Plaintiff Class, that he was a GunnAllen agent. Specifically, a newsletter published by Bluestein for his clients advertised "Securities offered through GunnAllen Financial, Inc. member FINRA/SIPC." **Exhibit G (Sample Maximum Newsletter)**. At the end of the newsletter was, in part, an announcement that "The author is a registered representative with GunnAllen Financial, Member FINRA/SIPC...."

48.     Maximum also sent "Letters From the Editor" advertising securities offered through Questar. **Exhibit H (Sample Maximum "Letters From the Editor")**. These newsletters made promises and assurances to the investors as to financial and investment topics and events, including the LLCs.

49.     Another example confirming characterizations to the Plaintiffs and the class of the May Ponzi scheme as a GunnAllen investment is revealed in an August 28, 2007 email sent to investors in the wake of the public scandal following the collapse of the Ponzi scheme. In the email, Bluestein advised his clients to come in and "see what we can do with some of the other registered investments that we offer thru GunnAllen." **Exhibit I**. The language used in this invitation is an unambiguous representation that the investments in the May Ponzi scheme were "other...investments" offered by GunnAllen and, therefore, were offered, backed and approved by GunnAllen.

50.     Defendants' representations were of a material nature.

12

51.     A reasonable investor would have found the above representations to be material since the contracts with the hotels and casinos were the purported source of any possible investor returns. In addition, Defendants' representations about a relationship between the LLCs and Hilton, MGM Grand, Motel 6, Tropicana and Sheraton, created a false sense of legitimacy in the eyes of a reasonable investor. Finally, statements that investors would receive guaranteed returns caused investors to falsely believe the investment was low risk.

52.     Defendants acted with intent as evidenced by the investment documents, contracts and their intentional representations to investors and potential investors concerning those contracts.

## D.     SPECIFIC EXAMLES OF PHONY LIMITED LIABILITY COMPANIES

53.     As set forth above, May and Bluestein represented to investors that E-M had contracts with various hotels, casinos, and similar establishments around the country for the installation and service of telecommunications equipment. In fact, no such contracts existed.

54.     May, Bluestein and their companies provided at least some investors with copies of contracts between the May LLCs and various hotels and casinos for the installation and service of telecommunications equipment. Some of these contracts turned out to have been executed by people who either did not exist or who have denied executing or having authority to execute such contracts.

55.     Pursuant to the lawsuit against May and E-M filed by the SEC and based on SEC investigation reports attached to that complaint (all of which are in file with this court and incorporated by reference) the following paragraphs describe some of the prominent examples of the companies falsely represented by May to have contracted with the May LLCs:

LAW OFFICES
**SOMMERS SCHWARTZ, P.C.**
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

(a).   Hilton Hotels

(i).   Defendants represented to investors that certain May LLCs had a contractual relationship with Hilton Hotel Corp. ("Hilton") in at least 39 different securities offerings. The investments in those LLCs raised approximately $27.4 million from investors.

(ii).   Offering materials disseminated by Defendants contained an "Agreement for Providing Telecommunications Service," which purported to be an agreement between Eubberoth Telecom LTD. ("Eubberoth") and a May LLC to provide telecommunication services to Hilton hotels. This agreement stated that Eubberoth is a Norwegian corporation that it is an agent for Hilton.

(iii).   Offering materials disseminated by Defendants also included a "Consolidated Communications Agreement," which purported to be an agreement between Hilton and a May LLC for telecommunication services. The agreement identified as a signatory, a former Senior Vice President of Hilton.

(iv).   In fact, Hilton has no business relationship with any May LLC or Eubberoth.

(v).   Additionally, the former Senior Vice President of Hilton has no knowledge or recollection of any such contract with a May LLC or Eubberoth.

(b).   MGM Grand Hotel

(i).   Defendants represented to investors that certain May LLCs had a contractual relationship with MGM Grand Hotel, LLC ("MGM Grand") in at least two different offerings. The investments in those May LLCs raised $2.9 million from investors.

(ii).   In a January 4, 2007 letter to investors, Defendants falsely represented to investors that a May LLC was the exclusive provider of telecommunications services and equipment to the MGM Grand.

(iii).   Further, Defendants provided a "Consolidated Communications Agreement" to investors, which purported to be an agreement between MGM-Mirage Resorts Inc. and the May LLC pursuant to

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

14

which the May LLC would provide telecommunications services to the MGM Grand.  This agreement identifies as a signatory, Randal A. Wolf, Vice President of Corporate for MGM-Mirage Resorts, Inc.

(iv).    In fact, however, MGM Grand has no business relationship with any May LLC.  Further, no one named Randal A. Wolf is, or ever has been, Vice President of Corporate for MGM-Mirage Resorts, Inc.

(v).    Additionally, MGM-Mirage Resorts, Inc. is not a legal entity associated with the MGM Grand.

(c).    Motel 6

(i).    Defendants represented to investors that a May LLC had a contract with a Motel 6 located in Dale, Indiana, in at least one offering.  The investment in that May LLC raised $437,040 from investors.

(ii).    In fact, the Motel 6 in Dale, Indiana, has never had a contract with a May LLC.

(d).    Tropicana Resort Casino

(i).    Defendants represented to investors that a May LLC had a contractual relationship with Tropicana Resort Casino ("Tropicana") in at least one offering.  The investments in that May LLC raised approximately $495,800 from investors.

(ii).    A "Consolidated Communications Agreement" to investors, which purported to be an agreement between Tropicana Resorts Inc. and the May LLC, pursuant to which the May LLC would provide communications services to Tropicana.  The agreement identified as a signatory Reed Stewart (also spelled Steward in the agreement), a Vice President of Corporate for Tropicana Resorts, Inc.

(iii).    In fact, Tropicana does not have any business relationship with a May LLC.

(iv).    Further, no person by the name of Reed Steward or Reed Stewart has ever served as vice president or senior officer of any kind for Tropicana Resorts, Inc.

15

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

(c).     Sheraton Hotels

(i).     Defendants represented that certain May LLCs had a contractual relationship with Sheraton hotels in at least two offerings. The investments in those May LLCs raised a total of approximately $1.3 million from investors.

(ii).     In fact, Starwood Hotel & Resorts Worldwide, Inc. ("Starwood"), owner of Sheraton hotels, has no records indicating that a May LLC conducted any business with Starwood.

56.     Defendants representations were of a material nature.

57.     A reasonable investor would have found the above representations to be material since the contracts with the hotels and casinos were the purported source of any possible investor returns. In addition, Defendants' representations about a relationship between the LLCs and Hilton, MGM Grand, Motel 6, Tropicana and Sheraton, created a false sense of legitimacy in the eyes of a reasonable investor. Finally, statements that investors would receive guaranteed returns caused investors to falsely believe the investment was low risk.

58.     Defendants acted with intent as evidenced by the investment documents, contracts and their intentional representations to investors and potential investors concerning those contracts.

**E.     COLLAPSE OF THE PONZI SCHEME**

59.     Bluestein's pattern of practice of soliciting investments in the May Ponzi scheme continued unabated for almost twelve years. Despite the fact that the May LLCs were phony and did not have the contracts to provide telecommunications services as represented to the investors, the continued sale of the sham investments and the improper pooling of investor funds permitted Defendant Bluestein to issue monthly checks to early investors.

60.     During the course of business over a number of years May, on behalf of E-M and the May LLCs, would deliver to Bluestein and Maximum investor return checks which were to be delivered to the investors upon notification from May to Bluestein that the funds were available and ready to

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER   •   SUITE 900   •   SOUTHFIELD, MICHIGAN 48075   •   (248) 355-0300

16

disburse. Upon information and belief, prior to mailing such checks to the investors, Bluestein would first cash his checks from the LLCs.

61.     Because the LLCs were merely shell companies without any revenue stream, like all Ponzi schemes, Defendants were eventually unable to make monthly payments in a timely manner.

62.     In November and December 2006, the frail shell that cloaked the truth behind the Ponzi scheme began to crack. Plaintiffs had received their checks monthly, however in November and December 2006 the checks were late. Plaintiffs called Defendant Bluestein inquiring about why the checks were late and they were told the delay was due to problems with direct deposit. **See Exhibit J, (December 3, 2006 Letter to Investors from E-M explaining the delay in issuing monthly checks).** After the delay in the payments, Defendant Bluestein and May began an intense effort to sell investments in the LLCs.

63.     The push for Defendant Bluestein to bring in more money became so extreme that in many instances, Defendant Bluestein contacted many people who had spent their last "liquid" dollar on previous LLCs and convinced them to mortgage their homes to buy more LLCs claiming the "guaranteed" income from the new LLCs will cover the increased mortgage payments, so they have nothing to worry about. It appears this unprecedented amount of sales was due to the crack in the shell becoming bigger and bigger as Defendants had more money being paid out than they had new investors coming in.

64.     In July 2007, the Ponzi shell was in pieces. According to May's lawsuit against Defendant Bluestein, July checks were cut however Defendants did not have the money to cover the checks. With numerous phone calls from Plaintiffs inquiring about their money, Defendant Bluestein, as alleged by May, knowing they did not have sufficient money to support the checks, mailed the checks regardless. Plaintiffs received the checks and many cashed them resulting in bank fees associated with

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

the checks bouncing. At this point the Ponzi scheme became painfully evident.

65.    On or about July 31, 2007, May sent a letter to the LLC investors attempting to explain delays in distributing the guaranteed monthly payments for July, 2007. **Exhibit K (May July 31 2007 Letter to Investors)**   May first blamed the delays on the difficulty of "maintaining mailing accuracy and volume" because the number of LLC projects had grown.

66.    On September 4, 2007, May sent an email to the LLC investors in which he stated "I know I have hurt and angered a huge number of people who had faith in me as both a friend and an advisor." He foreshadowed his blame of Bluestein when stated that he was "trying to get some other people to the table who have significant liability in these matters and who have the capacity to at least come close to making everyone whole." **Exhibit L (May September 4, 2007 Email)**.

67.    In August 2007 E-M completely ceased issuing any monthly checks to the LLC investors. The Ponzi scheme had collapsed under its own mountain of deceit and inability to secure new investors.

### F.    THE DISINTEGRATION OF THE MAY-BLUESTEIN RELATIONSHIP

68.    After the Ponzi scheme collapsed, Bluestein then pointed the finger of blame back at May. In an August 27, 2007 letter to investors, Bluestein acknowledged the existence of the May Ponzi scheme, that the investments in the May LLCs were nothing but a sham, and claimed that he, Frank Bluestein, had been taken in by the scheme and "believed" in the investments that May purported to offer. **Exhibit M (Bluestein August 27, 2007 Letter to Investors)**.

69.    In the same letter, Bluestein acknowledged that Plaintiffs suffered damages in the form of: (i) lost principal and (ii) loss of the allegedly "guaranteed" returns on investment. **Exhibit M**.

70.    In response to Bluestein's allegations, E-M sued Bluestein and Maximum in the Circuit Court for the County of Oakland, State of Michigan, Case No. 07-085253-CZ. **Exhibit N (First**

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

Amended Verified Complaint in Case No. 07-085253-CZ in Circuit Court for the County of Oakland, State of Michigan).

71.     In large part, May alleged in the suit that Bluestein had breached his fiduciary duty to advise May that his investments needed to be registered as securities; that Bluestein absconded with multiple millions of dollars all to the detriment of May and E-M; and that Bluestein utilized the absconded funds to secure foreign investments for himself.

72.     In the lawsuit, May and E-M admit that, together with Bluestein and Maximum, they obtained funds for investors in "unregistered securities".

73.     May and E-M further alleged that E-M was a management company on behalf of the various LLCs in which Plaintiffs invested, and that  Bluestein was a member of E-M and received compensation from E-M for his position as a member.

74.     May and E-M also alleged that Bluestein as an agent or employee of Maximum sold shares in the May LLCs to investors and were paid by such investors a fee for providing information to the investors.

### G.     LOSS CAUSATION/ECONOMIC LOSS

75.     Defendants presented a misleading picture of the May LLC's business and prospects. Thus, instead of truthfully disclosing during the Class Period that the May LLC's did not have the telecommunications contracts as represented, defendants falsely reported the May LLC's financial outlook and its actual business prospects going forward.

76.     These claims caused and maintained the purchases and investment in the May LLC's throughout the Class Period and until the truth was revealed to the market.

77.     Defendants' false and misleading statements had the intended effect and caused investment in the May LLC's throughout the Class Period, until early 2007 when the truth was revealed.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

78.    The truth about the May LLC's began to enter the market with missed checks beginning in November-December of 2006 which were accompanied by denials and continuing misrepresentations by defendants.

79.    As a direct result of defendants' admissions and the public revelations regarding the truth about the May LLC's, the value of the May investments at issue in this case plummeted to zero after August 27, 2007 when Bluestein wrote plaintiffs and the putative class members advising them of the sham LLC's. Here, real economic loss to investors who had purchased the stock during the Class Period was caused. **Exhibit O** (Plaintiff Loss Certifications).

## CLASS ALLEGATIONS

80.    Plaintiffs bring this action as a class action against Defendants, *inter alia*, pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a plaintiff class (the "Class") consisting of all persons and entities who purchased interests in various LLCs allegedly owned by E-M. Excluded from the Class are the Defendants in this action and May.

81.    The class consists of all investors in the May LLC's, and more specifically, two plaintiff subclasses defined as follows:

1.    **The Questar Class.**
All persons and entities who purchased an interest in LLCs that allegedly held telecommunications contracts with E-M from 2000 to 2005

2.    **The GunnAllen Class.**
All persons and entities who purchased an interest in LLCs that allegedly held telecommunications contracts with E-M from 2005 to 2007

82.    Members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. The exact number of Class members can be ascertained from Defendants' records.

20

83.     Plaintiffs will fairly and adequately protect the interests of all Class members and have retained counsel competent and experienced in class and securities litigation.

84.     Plaintiffs' claims are typical of the claims of the Class and all Class members sustained damages arising out of Defendants' wrongful conduct in violation of the federal and state laws complained of herein.

85.     There are questions of law and fact common to the Class which predominates over any questions solely affecting individual Class members. Among the questions of law and fact common to all Class members are:

(a)     Whether Defendants violated the federal and state securities laws and the common law by their actions as alleged herein;

(b)     Whether the interests in the LLCs purchased by Plaintiffs and Class members were "securities" which were required to have been registered under federal and/or state securities laws;

(c)     Whether, in connection with the sale of the interests in the LLCs to Plaintiffs and Class members, Defendants and/or the offering materials misrepresented or omitted material information regarding the LLCs, including statements about the LLCs business, assets, income, payments, and/or operations;

(d)     Whether the broker-dealer Defendants are "control" persons with respect to Bluestein's actions under Section 20(a) of the Federal Securities and Exchange Act of 1934, or Section 15 of the Federal Securities Act of 1933, or similar provision of the Michigan Uniform Securities Act;

(e)     Whether the broker-dealer Defendants were in a position of principal-agent under the common law of Michigan with respect to Bluestein;

(f)     Whether Bluestein was operating with apparent authority of the broker-dealer Defendants during the relevant time periods;

21

(g)     Whether the broker-dealer Defendants are liable for the actions of Bluestein under respondeat superior;

(h)     Whether Defendants participated in and pursued the common course of conduct complained of herein;

(i)     Whether the Class has sustained injury as a result of the Ponzi scheme, and if so, what is the proper measure of damages; and

(k)     Whether Defendants are liable to the Class under RICO.

86.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  Furthermore, the expense and burden of individual litigation makes it impossible for the Class members to individually redress the wrongs done to them.

## COUNT I

## VIOLATIONS OF SECTION 12(1) OF THE SECURITIES ACT OF 1933

87.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

88.    The investments in the May LLCs which were offered and sold to Plaintiffs and the Class were "securities" as defined in Section 2(1) of the Securities Act of 1933, 15 U.S.C. §77b(1).  Those securities were offered for sale and/or sold by Defendants Bluestein and Maximum.

89.    The investments sold by Bluestein and Maximum and purchased by Plaintiffs and the Class do not constitute a class of securities exempt from registration pursuant to any of the provisions of the Securities Act, nor were these securities offered and sold in a transaction exempt under the provisions of the Securities Act.  In connection with such transactions, Defendants Bluestein and

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

22

Maximum failed to deliver a prospectus consistent with the requirements of Section 5 or the Securities Act of 1933, as amended.

90.     Defendants Bluestein and Maximum utilized the means of interstate commerce and the mails to offer, sell, and deliver the securities without any registration statement being in effect and without the use of a prospectus meeting the requirements of the securities laws. Defendants Bluestein and Maximum thereby violated Section 12(1) of the Securities Act of 1933, 15 U.S.C. 77l.

91.     Plaintiffs and each class member hereby tender back to Defendants Bluestein and Maximum all investments in the LLCs acquired.

92.     Plaintiffs and the Class have been damaged by the conduct of Defendants Bluestein and Maximum.

## COUNT II

## VIOLATION OF SECTION 12(2) OF THE SECURITIES ACT OF 1933

93.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

94.     The investments in the LLCs which were offered and sold to Plaintiffs and the class were "securities" under the as defined in Section 2(1) of the Securities Act,15 U.S.C. §77b(1) and Section 3(a)(9) of the Exchange Act, 15 U.S.C. §78c(a)(10). Those securities were offered for sale and/or sold by Defendants Bluestein and Maximum.

95.     Defendants Bluestein and Maximum, by use of the means and instrumentality of interstate commerce or the use of the mails, engaged in the use of manipulative and deceptive practices in connection with the sale of such securities to Plaintiffs and the members of the Class in violation of Section 12(2) of the Securities Act, 15 U.S.C. §77l(a)(2).

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

96.     Such manipulative and deceptive practices included, *inter alia*, the use of untrue statements of material fact and the omission of material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading, as particularly alleged above, that a reasonable investor would have considered important in making an investment decision in connection with the May LLCs. Such statements include, but are not limited to, statements that the May LLCs had entered into legitimate contracts with hotels and casinos for the installation and servicing of telecommunications equipment, and that such contracts would provide the revenue stream necessary to repay the investors' principal and to provide the allegedly "guaranteed" returns on investments.

97.     Such Defendants knowingly or recklessly made such untrue statements and omissions of material fact for the purpose of inducing Plaintiffs and the Class members to purchase such securities.

98.     Plaintiffs and the Class members justifiably relied on such untrue statements and omissions of material fact in deciding to purchase such securities.

99.     Plaintiffs and the Class members also justifiably relied on the honesty and integrity of all Defendants and the processes and procedures supposedly used and followed to issue and sell the interests in the LLCs.

100.    In fact, had the Plaintiffs and other Class members known of the fraud perpetrated by Defendants in connection with the issuance, distribution and sale of the interests in the LLCs, such securities could not have been sold at any price.

101.    As a result of Defendants' conduct, the investments made by Plaintiffs and the Class members in the LLCs are likely valueless and Plaintiffs and the Class members have suffered damages.

102.    By reason of the acts, omissions, practices, and courses of business set forth herein, Defendants have violated 12(2) of the Securities Act, 15 U.S.C. §77l(a)(2).

## COUNT III

### VIOLATION OF SECTION 15 OF THE SECURITIES ACT OF 1933
### (AGAINST DEFENDANTS QUESTAR AND GUNNALLEN)

103.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

104.     Plaintiffs, on their own behalf and on behalf of the Class, assert this Count against Defendants Questar and GunnAllen under Section 15 of the Securities Act, 15 U.S.C. §77o.

105.     By virtue, *inter alia*, of Defendant Bluestein's position as a registered representative of broker-dealer Defendant Questar and broker-dealer Defendant GunnAllen and Questar's and GunnAllen's corresponding duty to supervise Bluestein and Maximum, Questar and GunnAllen had the power and ability to control Bluestein and Maximum in connection with the offer for sale and/or sale of the interests in the LLCs to Plaintiffs and the Class.

106.     Broker-dealer Defendant Questar and broker-dealer Defendant GunnAllen exercised actual control over the general operations of Defendants Bluestein and Maximum during the time periods when Bluestein was a registered agent of each broker-dealer.

107.     As such, Defendants Questar and GunnAllen are "control persons" under Section 15 of the Securities Act and are liable to Plaintiffs and the Class for the acts and omissions of Defendants Bluestein and Maximum.

## COUNT IV

### VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10(B)-5
### PROMULGATED THEREUNDER

108.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

109.    The investments in the LLCs which were offered and sold to Plaintiffs and the Class were "securities" under the as defined in Section 2(1) of the Securities Act (15 U.S.C. §77b(1)) and Section 3(a)(9) of the Exchange Act (15 U.S.C. §78c(a)(10)). Those securities were offered for sale and/or sold by Defendants Bluestein and Maximum.

110.    Defendants Bluestein and Maximum, by use of the means and instrumentality of interstate commerce or the use of the mails, engaged in the use of manipulative and deceptive practices in connection with the sale of such securities to Plaintiffs and the members of the Class in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

111.    Such manipulative and deceptive practices included, *inter alia*, the use of untrue statements of material fact and the omission of material facts as particularly alleged above that a reasonable investor would have considered important in making an investment decision in connection with the LLCs. Such statements include, but are not limited to, statements that the LLCs had entered into legitimate contracts with hotels and casinos for the installation and servicing of telecommunications equipment, and that such contracts would provide the revenue stream necessary to repay the investors' principal and to provide the allegedly "guaranteed" returns on investment.

112.    Such Defendants knowingly or recklessly made such untrue statements and omissions of material fact for the purpose of inducing Plaintiffs and the Class members to purchase such securities.

113.    Plaintiffs and the Class members justifiably relied on such untrue statements and omissions of material fact in deciding to purchase such securities.

114.    Plaintiffs and the Class members also justifiably relied on the honesty and integrity of all Defendants and the processes and procedures supposedly used and followed to issue and sell the interests in the LLCs.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

115.   In fact, had the Plaintiffs and other Class members known of the fraud perpetrated by Defendants in connection with the issuance, distribution and sale of the interests in the LLCs, such securities could not have been sold at any price.

116.   As a result of Defendants' conduct, the investments made by Plaintiffs and the Class members in the LLCs are likely valueless and Plaintiffs and the Class members have suffered damages.

117.   By reason of the acts, omissions, practices, and courses of business set forth herein, Defendants have violated  Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

## COUNT V

### VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT (AGAINST DEFENDANTS QUESTAR AND GUNNALLEN)

118.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

119.   Plaintiffs, on their own behalf and on behalf of the Class, assert this Count against Defendants Questar and GunnAllen under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

120.   By virtue, *inter alia*, of Defendant Bluestein's position as a registered representative of broker-dealer Defendant Questar and broker-dealer Defendant GunnAllen and Questar's and GunnAllen's corresponding duty to supervise Bluestein and Maximum, Questar and GunnAllen had the power and ability to control Bluestein and Maximum in connection with the offer for sale and/or sale of the interests in the LLCs to Plaintiffs and the Class.

121.   Broker-dealer Defendant Questar and broker-dealer Defendant GunnAllen exercised actual control over the general operations of Defendants Bluestein and Maximum during the time periods when Bluestein was a registered agent of each broker-dealer.

122.    As such, Defendants Questar and GunnAllen are "control persons" under Section 20(a) of the Exchange Act and are liable to Plaintiffs and the Class for the acts and omissions of Defendants Bluestein and Maximum.

## COUNT VI

### VIOLATIONS OF SECTION 301 OF THE MICHIGAN UNIFORM SECURITIES ACT

123.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

124.    The interests in the May LLCs were not registered under the Michigan Uniform Securities Act, MCL 451.501, *at seq.*

125.    The interests in the May LLCs were not exempt from registration under MLC 451.802.

126.    The interests in the May LLCs were not federally covered securities.

127.    By their actions above, Bluestein and/or Maximum offered for sale and sold to Plaintiffs and the Class unregistered securities in violation of Section 301 of the Michigan Uniform Securities Act, MCL 451.701.

128.    By reason of these violations, Defendants are liable to Plaintiffs and the Class for the consideration paid for their investments, with interest at 6% per year from the date of each purchase, plus costs and reasonable attorney fees. MCL 451810(a)(6).

## COUNT VII

### VIOLATION OF SECTION 410 OF THE MICHIGAN UNIFORM SECURITIES ACT

129.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

130.    As described above, Defendants, in connection with the purchase and sale of the interests in the May LLCs to Plaintiffs and the Class, made untrue statements of material fact and omitted to state

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 410(a)(2) of the Michigan Uniform Securities Act. MCL 451.810(a)(2).

131.    By reason of this violation stated above, Defendants are liable to Plaintiffs and the Class for the consideration paid for their investments, with interest at 6% per year from the date of each purchase, plus costs and reasonable attorney fees. MCL 451.810(a)(2).

## COUNT VIII

## VIOLATION OF SECTION 451 OF THE MICHIGAN UNIFORM SECURITIES ACT (AGAINST DEFENDANTS BLUESTEIN, QUESTAR AND GUNNALLEN)

132.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

133.    By virtue, *inter alia*, of Defendant Bluestein's position as a registered representative of broker-dealer Defendant Questar and broker-dealer Defendant GunnAllen and Questar's and GunnAllen's corresponding duty to supervise Bluestein and Maximum, Questar and GunnAllen had the power and ability to control Bluestein and Maximum in connection with the offer for sale and/or sale of the interests in the LLCs to Plaintiffs and the Class. Questar and GunnAllen therefore are liable for the violations of the Michigan Uniform Securities Act by Bluestein and Maximum. MCL 451.810(b).

134.    Bluestein is a control person of Maximum in connection with the offer and sale of the interests in the May LLCs to Plaintiffs and the Class. Therefore, Bluestein is separately liable for Maximum's violations of the Michigan Uniform Securities Act.

135.    As control persons, Questar, GunnAllen and Bluestein are jointly and severally liable to Plaintiffs and the Class for the consideration paid for their investments, with interest at 6 % per year from the date of each purchase, plus costs and reasonable attorney fees. MCL 451.81 0(a)(1) and (2).

## COUNT IX

### FAILURE TO SUPERVISE
### (AGAINST DEFENDANTS QUESTAR AND GUNNALLEN)

136.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

137.    Defendants GunnAllen and Questar as "controlling persons" over their agent, Defendant Bluestein, had a duty to establish and maintain a system to supervise the activities of each registered representative, investment advisor and associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations.  They had a duty to ultimately protect Plaintiffs and the Class from Defendants Questar and GunnAllen's agents and ensure Plaintiffs' money being tendered and entrusted with said agents for investment purposes was being properly and legally invested.

138.    Defendants Questar and GunnAllen cloaked Defendants Bluestein and Maximum, their agents to whom they paid money for selling securities to investors such as Plaintiffs and the Class, with their goodwill and credibility, through use of their marketing material, use of their companies for investing Plaintiffs' money, use of Defendants Questar and GunnAllen's name on Defendants Bluestein's and Maximums business cards, letterhead, office signs and building, etc.  In doing so, Defendants Questar and GunnAllen allowed their agents, Defendants Bluestein and Maximum, to then market securities to potential investors, including Plaintiffs and the Class, which would result in fees being paid by Plaintiffs to Defendants Questar and GunnAllen.

140.    In the course of their relationship as agents and representatives of Defendants Questar and GunnAllen, Defendants Bluestein and Maximum were able to sell the above described fraudulent investments to Plaintiffs and the Class.  Indeed, Defendant Bluestein held a sales meeting at which Defendant GunnAllen representatives were present and Defendant Bluestein openly, and very proudly,

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

30

discussed the "Ed May Investments." With Defendant GunnAllen present and while discussing investments offered through and/or with GunnAllen, Defendant Bluestein asked the audience, which included some of the Plaintiffs, "Who received their Ed May Checks?" As numerous hands were thrust happily in the air, those who had not yet invested in the May LLCs, almost immediately and loudly inquired how they too could "get in on these hot investments" and begin receiving their "Ed May Checks." Defendant GunnAllen sat silently and did nothing to prevent the sale of these unregistered fraudulent securities to Plaintiffs and the Class.

141. Defendants Questar and GunnAllen breached their supervisory responsibilities in multiple instances with respect to Plaintiffs and the Class, including by: (a) failing to establish and maintain a system to supervise to achieve reasonable compliance with securities laws and exchange laws, rules and regulations; and/or (b) failing to properly supervise Plaintiffs' accounts and ensure that legal transactions and investments were selected for Plaintiffs and the Class.

142. As a result of Defendants Questar and GunnAllen's breach, Defendants Bluestein and Maximum were able to sell the unregistered fraudulent investments to Plaintiffs and the Class.

143. As a direct and proximate result of the violation and breach of their supervisory responsibilities, Plaintiffs were damaged.

## COUNT X

### FRAUD
### (AGAINST DEFENDANTS BLUESTEIN AND MAXIMUM)

144. Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

145. As described in detail above, Defendants Bluestein and Maximum made misrepresentations of material fact to the Plaintiffs and the Class members, and omitted material facts, in connection with the purchase by Plaintiffs and the Class members of the interests in the LLCs.

31

146.   Defendants Bluestein and Maximum knew, at all relevant times, that the funds invested in the LLCs would not be used to fund the installation and servicing of telecommunications equipment for hotels and casinos as represented by such Defendants to Plaintiffs and the Class members, but, in fact, were commingled together in a pool and were used, *inter alia,* to pay the "guaranteed returns" to other investors, for other purposes wholly unrelated to the proposed investments, or for other improper and/or unauthorized purposes, and knew that the contracts underlying the interests in the LLCs were completely fabricated.

147.   Plaintiffs and the Class members did not know, and were never on notice, that the funds invested in the LLCs would not be used to fund the installation and servicing of telecommunications equipment for hotels and casinos as represented by such Defendants to Plaintiffs and the Class members, but, in fact, were commingled together in a pool and were used, *inter alia,* to pay the "guaranteed returns" to other investors, for other purposes wholly unrelated to the proposed investments, or for other improper and/or unauthorized purposes, and did not know that the contracts underlying the interests in the LLCs were completely fabricated.

148.   Plaintiffs and the Class members reasonably relied upon such fraudulent representations; *inter alia,* they were induced to purchase the interests in the LLCs wholly unaware that the funds they invested would not be used as represented.

149.   The representations by Defendants Bluestein and Maximum:  (i) were material: (ii) were false when made; (iii) were known by such Defendants to be false; and (iv) were made in an attempt to deceive Plaintiffs and the Class members into purchasing worthless interests in the LLCs.

150.   By virtue of the fraudulent conduct of Defendants Bluestein and Maximum, as more fully set forth above, including but not limited to the fraudulent and deceptive representations made to the Plaintiffs and the Class members, the active concealment of such Defendants' fraudulent conduct, and

32

the lack of disclosure, Plaintiffs and the Class members have been defrauded and deceived by Defendants Bluestein and Maximum.

151.   The failure of Defendants Bluestein and Maximum to disclose the actual purpose for the funds invested and such Defendants' fabrication and concealment of material facts of which such Defendants had an affirmative duty to disclose to the Plaintiffs and the Class members, were willful and deliberate, and the Plaintiffs and the Class members relied on the fraudulent and deceitful conduct to their detriment, damage and loss.

152.   Based on the foregoing, Plaintiffs and the Class members have been damaged in an amount to be determined and awarded at trial.

153.   The fraudulent and deceitful acts of misrepresentation and omissions of material facts by Defendants Bluestein and Maximum and the fabrication and concealment of such material facts by such Defendants was willful and wanton, and in reckless disregard for the Plaintiffs and the Class members. As such, Plaintiffs and the Class members are also entitled to punitive damages.

## COUNT XI

### NEGLIGENT MISREPRESENTATION
### (AGAINST DEFENDANTS BLUESTEIN AND MAXIMUM)

154.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

155.   As described in detail above, Defendants Bluestein and Maximum made misrepresentations of material fact to the Plaintiffs and the Class members, and omitted material facts, in connection with the purchase by Plaintiffs and the Class members of the interests in the LLCs.

156.   In making said misrepresentations, Defendants Bluestein and Maximum misstated and omitted to state material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading. Among the direct and proximate causes of said misrepresentations were the negligence and carelessness of Defendants Bluestein and Maximum, and the absence of any reasonable basis for their belief in the truth of such statements.

157.   At the time of said misrepresentations, Plaintiffs and the Class members were ignorant of the falsity of said misrepresentations and believed them to be true.   In reliance on said misrepresentations and in reliance upon the superior knowledge and expertise of the Defendants, Plaintiffs and the Class members were induced into and did purchase the interests in the LLCs. Had Plaintiffs and the Class members known the truth, they would not have made such purchases. By reason thereof, Plaintiffs and the Class members have been damaged.

158.   Based on the foregoing, Plaintiffs and the Class members have been damaged in an amount to be determined and awarded at trial.

## COUNT XII

### RESPONDEAT SUPERIOR
### (AGAINST DEFENDANTS QUESTAR AND GUNNALLEN)

159.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

160.   During the time Defendant Bluestein was a registered broker and representative of Defendant Questar from 2000 to 2005, Defendants Bluestein and/or Maximum acted for the benefit of Defendant Questar.

161.   Defendant Questar was negligent and/or reckless in permitting Defendants Bluestein and/or Maximum to market the worthless interests in the LLCs.

LAW OFFICES
**SOMMERS SCHWARTZ, P.C.**
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

162.    During the time Defendant Bluestein was a registered broker and representative of GunnAllen from 2005 to 2007, and managed their Waterford, Michigan office, Defendants Bluestein and/or Maximum acted for the benefit of Defendant GunnAllen.

163.    Defendant GunnAllen was negligent and/or reckless in permitting Defendants Bluestein and/or Maximum to market the worthless interests in the LLCs.

164.    The Plaintiffs and the Class members were damaged by such negligence of Defendants Questar and GunnAllen.

165.    Therefore, Defendants Questar and GunnAllen are liable to Plaintiffs and the Class members under the theory of respondeat superior for Defendants Bluestein's and/or Maximum's violations of Section 12(1) of the Securities Act of 1933, 15 U.S.C. §77l(a)(1), Section 12(2) of the Securities Act of 1933, 15 U.S.C. §77l(a)(2), Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, the Michigan Uniform Securities Act, and for Defendants Bluestein's and/or Maximum's fraud and negligent misrepresentation.

## COUNT XIII

### APPARENT AUTHORITY
### (AGAINST DEFENDANTS QUESTAR AND GUNNALLEN)

166.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

167.    During the time Defendant Bluestein was a registered broker and representative of Defendant Questar from 2000 to 2005, Defendant Questar cloaked Defendants Bluestein and/or Maximum with apparent authority by holding out Defendants Bluestein and/or Maximum as possessing sufficient authority so as to induce the purchase of the worthless interests in the LLCs by Plaintiffs and the Class members.

168.    The solicitation and sale of the worthless interests in the LLCs by Defendants Bluestein and/or Maximum to Plaintiffs and the Class members seemed regular on their face and Defendants Bluestein and/or Maximum appeared to be acting in the ordinary course of business as Defendant Questar's registered representative.

169.    Plaintiffs and the Class members relied on such apparent authority in purchasing the worthless interests in the LLCs from Defendants Bluestein and/or Maximum.

170.    During the time Defendant Bluestein was a registered broker and representative of GunnAllen from 2005 to 2007, and managed their Waterford, Michigan office, Defendant GunnAllen cloaked Defendants Bluestein and/or Maximum with apparent authority by holding out Defendants Bluestein and/or Maximum as possessing sufficient authority so as to induce the purchase of the worthless interests in the LLCs by Plaintiffs and the Class members.

171.    The solicitation and sale of the worthless interests in the LLCs by Defendants Bluestein and/or Maximum to Plaintiffs and the Class members seemed regular on their face and Defendants Bluestein and/or Maximum appeared to be acting in the ordinary course of business as Defendant GunnAllen's registered representative.

172.    Plaintiffs and the Class members relied on such apparent authority in purchasing the worthless interests in the LLCs from Defendants Bluestein and/or Maximum.

173.    Therefore, Defendants Questar and GunnAllen are liable to Plaintiffs and the Class members under the theory of apparent authority for Defendants Bluestein's and/or Maximum's violations of Section 12(1) of the Securities Act of 1933, 15 U.S.C. §77l(a)(1), Section 12(2) of the Securities Act of 1933, 15 U.S.C. §77l(a)(2), Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, the Michigan Uniform Securities Act, and for Defendants Bluestein's and/or Maximum's fraud and negligent misrepresentation.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

36

## COUNT XIV

### BREACH OF FIDUCIARY DUTY

174.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

175.    In rendering financial and investment advice to the Plaintiffs and the Class and in offering for sale and selling the interests in the May LLCs to Plaintiffs and the Class, Bluestein and Maximum acted as the representatives, agents and/or employees of Questar and GunnAllen.

176.    Defendants held themselves out as experienced financial advisors and financial planners who were competent to advise Plaintiffs and the Class on the proper investment of their assets in light of their financial needs and their circumstances.

177.    Defendants owed fiduciary duties to Plaintiffs and the Class based on Defendants' position as financial advisors and planners.

178.    Defendants also owed fiduciary duties to Plaintiffs and the Class in light of the faith, confidence and trust they placed in Defendants.

179.    The fiduciary duties that Defendants owed to the Plaintiffs and the Class include, but are not limited to:

a. The duty to provide proper and competent investment advice.

b. The duty to recommend and make investments that comported with each Plaintiff and Class member's needs and circumstances.

c. The duty to act in the best interests of each Plaintiff and Class member concerning their investments and the financial advice given to them.

180.    Defendants breached the fiduciary duties that they owed to Plaintiffs and the Class by the acts and omissions set forth above, including, but not limited to:

37

a. Recommending and making investments that were unsuitable for each Plaintiff and Class member's investment needs and their circumstances.

b. Failing to act in the best interests of each Plaintiff and Class member and/or engaging in transactions that primarily benefitted Defendants.

c. Failing to conduct adequate investigation and due diligence concerning the investments Defendants recommended, offered and/or sold to the Plaintiffs and the Class.

d. Failing to fully inform the Plaintiffs and the Class of the risks involved with the interests in the May LLCs.

181.   As a proximate result of Defendants' breach of fiduciary duties, Plaintiffs and the Class have suffered damages in an amount to be determined and awarded at trial.

## COUNT XV

### NEGLIGENCE

182.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

183.   Plaintiffs and the Class were owed, at a minimum, a general duty of reasonable care by Defendants in their dealings based on their relationship.

184.   Defendants breached their duty of general care through their actions and inactions, as set forth above.

185.   Defendants breach of duty owed to Plaintiffs and the Class was a direct and proximate cause of financial and emotional damages, for which they are jointly and severally liable.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

## COUNT XVI

### CIVIL CONSPIRACY

186.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

187.    As set forth above and confirmed in the Exhibits attached hereto, Defendants acted in concert and with design amounting to a civil conspiracy under the law.

188.    Defendants' actions were a direct and proximate cause of financial damages to Plaintiffs and the Class through their actions and inactions, as set forth above.

189.    Defendants are jointly and severally liable.

## COUNT XVII

### UNJUST ENRICHMENT (IN THE ALTERNATIVE)

190.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

191.    As set forth above and confirmed in the Exhibits attached hereto, Defendants' actions and omissions resulted in Plaintiffs tendering money to Defendants, and Defendants obtaining and retaining those funds.

192.    Defendants' actions and omissions were wrongful and designed to benefit Defendants. They have been unjustly enriched as a direct and proximate result of their actions as set forth above.

193.    Defendants are jointly and severally liable under equity principals to return all ill-gotten gain, including the money they wrongfully obtained and retained from Plaintiffs and the Class.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

## COUNT XVIII

### VIOLATION OF § 1962(A) AND (D) OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ("RICO") ACT
### (AGAINST DEFENDANTS BLUESTEIN AND MAXIMUM)

194.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

195.    Pursuant to § 1962(c) of the RICO Act: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

196.    Pursuant to § 1962(d) of the RICO Act: It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

### A.    ENTERPRISES

197.    Defendant Maximum is a legal entity capable of holding a legal or beneficial interest in property and is a proper defendant "person" within the definition of the RICO Act, § 1961(3) and an "enterprise" as defined in RICO Act, § 1961(4) ("Maximum Enterprise").

198.    E-M Management Co, LLC is a legal entity capable of holding a legal or beneficial interest in property and is a proper defendant "person" within the definition of the RICO Act, § 1961(3) and an "enterprise" as defined in RICO Act, § 1961(4) ("E-M Enterprise").

199.    May and Bluestein, together and by and through with their respective companies, E-M and Maximum, were an association in fact within the definition of the RICO Act, § 1961(4). ("May-Bluestein Association-in-Fact").

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

40

**B.   COMMON PURPOSE**

200.    The above-named Enterprises and Association-in-Fact worked together as a cohesive group for several years as described above, sharing a common purpose: to raise money from investors by selling shares in phony LLCs.

201.    The common purpose was fraudulent in nature.  As described above, May and Bluestein represented to investors that the LLCs held telecommunications contracts that generated revenue, which in turn was to be distributed to the investors as owners of the LLCs. Not a single representation was accurate.

**C.   RACKETEERING AND PATERN OF ACTIVITY**

202.    Each entity and person within the May-Bluestein Association-in-Fact played a distinct role in the scheme; each were integral in pulling off the Ponzi scheme; and in fact each participated, directed, managed and exercised control over racketeering activities of the Enterprises.

203.    As described in more detail above and supported with the attached Exhibits, May created phony LLC contracts and related investment documents in order to create the appearance of actual LLC companies with telecommunication contracts and significant revenue generating potential, all to fraudulently obtain funds from investors.  He also issued the monthly checks to investors to further the scheme and obtain more investments.

204.    Bluestein, as a registered representative of first Questar and then GunnAllen, assisted May in creating the impression that the May LLCs were real entities, held telecommunication contracts with hotel chains across the United States and generated revenue for investors.

205.    Bluestein hosted parties where investors were told about "Ed May checks" in order to create interest in the May LLCs and to encourage investments.

206.    Bluestein, first through Questar and then GunnAllen, used his position as a registered representative of those companies and trusted advisor to gain the confidence of his clients.  He gave

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

professional advice and made recommendations to his clients, with the primary purpose being to secure investments in the phony May LLCs.

207.    The May-Bluestein Association-in-Fact operated in this fashion and pattern for approximately twelve years until the Ponzi scheme collapsed in 2007.

208.    During that time, it functioned as an ongoing and continuing unit with structural and financial ties. The activities engaged in were all directed to the same purpose, (acquiring investments in the LLCs) had the same results, (fraudulently obtaining money from investors) and used similar methods (phony LLCs and related misrepresentations).

209.    The May-Bluestein Association-in-Fact activities constituted actionable mail and wire fraud. Specifically, during the Class Period, Defendants disseminated through the United States mails, internet, and wires numerous fraudulent representations regarding the LLCs and investments, as more fully identified above and supported by the attached Exhibits.

210.    The racketeering activities of the May-Bluestein Association-in-Fact had a substantial effect on interstate commerce. Reported losses are estimated to be approximately $350,000,000.00. Furthermore, from their locations in Michigan, May and Bluestein sent and disseminated their fraudulent representations and statements to investors throughout the United States, including specifically, California, Illinois, Michigan, New York, Florida, New Jersey, and Ohio; issued invoices, billing statements and account summaries to purchasers throughout the United States; accepted payment for interests in the LLCs from investors throughout the United States; and engaged in banking transactions throughout the United States, including specifically, California, Illinois, Michigan, New York, Florida, New Jersey, and Ohio.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER  •  SUITE 900  •  SOUTHFIELD, MICHIGAN 48075  •  (248) 355-0300

42

211.   The May-Bluestein Association-in-Fact's pattern of racketeering activity was designed to obtain investors' money through fraudulent means, and directly and proximately caused investors, including Plaintiffs and the Class, to suffer substantial financial injury.

### D.   RICO VIOLATIONS

212.   The May-Bluestein Association-in-Fact violated the RICO Act, including section (c) (conducting racketeering activity) and section (d) (conspiring with one another during the relevant time periods to violate sections (a)-(c)) as set forth above.

### RELIEF REQUESTED

WHEREFORE, Plaintiffs demand judgement as follows:

(a)   Certifying this action as a plaintiff class action and a defendant class action under Federal Rule of Civil Procedure 23, and naming Plaintiffs as class representatives and their counsel as Class Counsel;

(b)   Awarding Plaintiffs and the Class their damages, including the purchase price of all securities purchased by them together with prejudgment interest, or rescission of the purchase price of such securities, and their owed return on investment;

(c)   Awarding Plaintiffs and the Class punitive damages under Count X;

(d)   Awarding Plaintiffs and the Class reasonable attorneys fees, and their costs and expenses under each of the Counts of the complaint; and

(e)   Awarding Plaintiffs and the Class damages and relief as set forth in the RICO Act.

(f)   Awarding Plaintiffs and the Class such other relief as the court deems just and proper.

LAW OFFICES
SOMMERS SCHWARTZ, P.C.
2000 TOWN CENTER   •   SUITE 900   •   SOUTHFIELD, MICHIGAN 48075   •   (248) 355-0300

43

## DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 39(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury

in this action.

Dated: March 4, 2008

SOMMERS SCHWARTZ, PC
Andrew Kochanowski (P55117)
Lisa R. Mikalonis (P39485)
2000 Town Center, Suite 900
Southfield, MI 48075
(248) 355-0300
*Attorneys for Plaintiffs*

J. THOMPSON & ASSOCIATES PLC
Jason J. Thompson (P47184)
2000 Town Center, Suite 1000
Southfield, MI 48075
(248) 436-8448
*Attorneys for Plaintiffs*

PAUL L. NINE & ASSOCIATES PC
Paul L. Nine (P18307)
Darin J. LeBeau (P54875)
100 W. Long Lake Road, Ste. 102
Bloomfield Hills, MI 48304
(248) 644-5500
*Attorneys for Plaintiffs*

ZIMMERMAN REED, PLLP
Timothy J. Becker
Kirsten D. Hedberg
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
(612) 341-0400
*Attorneys for Plaintiffs*

LAW OFFICES
**SOMMERS SCHWARTZ, P.C.**
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

Ex. A

# PRIVATE OFFERING MEMORANDUM

# H.P. PROJECT TWENTY SEVEN LLC

**E-M MANAGEMENT CO. LLC**
**720 N. LAPEER RD.**
**SUITE 202**
**LAKE ORION, MI 48362**